1  Janet Lindner Spielberg (SBN 221926)
   **LAW OFFICES OF JANET LINDNER**
2    **SPIELBERG**
3  12400 Wilshire Boulevard, #400
   Los Angeles, California 90025
4  Tel: (310) 392-8801
   Fax: (310) 278-5938
5
   Michael D. Braun (SBN 167416)
6  **BRAUN LAW GROUP, P.C.**
   10680 West Pico Boulevard, Suite 280
7  Los Angeles, California 90064
8  Tel: (310) 836-6000
   Fax: (310) 836-6010

E-filing

9  *ATTORNEYS FOR PLAINTIFF*

10

11           **IN THE UNITED STATES DISTRICT COURT**

12         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13  ELLIOT ZEISEL,                    )   CASE NO.
14  on behalf of himself and all others )
    similarly situated,               )   **CLASS ACTION**
15                                    )
                          Plaintiff,  )   **COMPLAINT FOR DAMAGES,**
16                                    )   **EQUITABLE, DECLARATORY**
                                      )   **AND INJUNCTIVE RELIEF**
17         v.                         )
                                      )
18  DIAMOND FOODS, INC.,              )   **DEMAND FOR JURY TRIAL**
    a Delaware corporation,           )
19                                    )
                          Defendant.  )
20

21        Plaintiff, by his attorneys, brings this class action against Defendant Diamond Foods, Inc.

22  ("Diamond" or "Defendant"), on his own behalf and on behalf of all others similarly situated, and

23  alleges as follows based upon the investigation of his counsel:

24                          **INTRODUCTION**

25        1.    This is a class action against Diamond, seeking relief on behalf of a national class of

26  consumers who purchased Diamond of California Shelled Walnuts ("Shelled Walnuts") products

27  beginning March 19, 2006 through the present. Since at least 2006, Diamond used false and

28  misleading packaging to entice consumers to purchase its Shelled Walnuts products. As a result of

                                       1

1  this false and misleading packaging, Diamond was able to sell these products to thousands of

2  consumers in California and throughout the United States and to profit from these transactions.

3      2.     Since at least 2006, Defendant has used express and implied statements about the

4  positive effects of omega-3 fatty acid consumption on health to entice consumers to purchase its

5  Shelled Walnuts products.  The front and back of the packaging for its Shelled Walnuts products

6  state: "OMEGA 3 2.5g per serving" with adjacent heart symbols, thereby implying that consumption

7  of the omega-3 fatty acids found in walnuts is linked to heart health.  The packaging also includes

8  the statement that "The omega-3 in walnuts can help you get the proper balance of fatty acids your

9  body needs for promoting heart health.  In fact, according to the Food and Drug Administration,

10  supportive but not conclusive research shows that eating 1.5 oz of walnuts per day, as part of a low-

11  saturated and low cholesterol diet, and not resulting in increased caloric intake, may reduce the risk

12  of coronary heart disease."

13      3.     In truth, as the FDA advised Defendant in February, 2010, there is not sufficient

14  evidence to identify a biologically active substance in walnuts that reduces the risk of coronary heart

15  disease ("CHD") or to support the statement that the omega-3 fatty acids found in walnuts promote

16  heart health or reduce the risk of CHD.  Defendant's health claims are therefore unauthorized under

17  
18  federal law and misleading to consumers.  As the FDA specifically found in February 2010,

19  Defendant's Shelled Walnuts products are "in violation of the Federal Food, Drug, and Cosmetic Act

20  and the applicable regulations in Title 21, Code of Federal Regulations" and are "misbranded under

21  section 403(r)(1)(B) of the Act [21 U.S.C. § 342(r)(1)(B) in that [Diamond's] products bear health

22  claims that are not authorized by the FDA."

23      4.     Diamond has its principal place of business in San Francisco, California and operates,

24  manages and directs its nationwide sales and business operations from its offices in California.

25  Diamond has six of its eleven United States locations in California, from which Diamond operates

26  and directs the majority, or at least a substantial proportion, of its nationwide sales and business

27  operations. It is therefore believed and averred that the misleading labeling and related misconduct

28  

2

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

at issue in this Complaint occurred, were conducted and/or were directed primarily from, or at least a substantial proportion emanated from, California, including, but not limited to: a) the design of the Shelled Walnuts packaging; b) the review, approval and revision of Shelled Walnuts products and labeling; and c) the management and supervision of sales operations to Plaintiffs and the Class.

5.      Plaintiff alleges Diamond's conduct violates the unlawful, unfair and fraudulent prongs of California's Business and Professions Code section 17200, et. seq. (the "UCL"), the California Business & Professions Code 17500 et. seq. (the "FAA"), and the Consumer Legal Remedies Act ("CLRA"). Plaintiff also alleges that Diamond's conduct is grounds for restitution on a quasi-contract/unjust enrichment basis.

### PARTIES

6.      Plaintiff Elliot Zeisel is an individual who is a citizen of the State of New York, residing in New York, New York. He is a consumer who purchased Defendant's Shelled Walnuts products on multiple occasions between February 15, 2006 and the present while residing in New York. Plaintiff purchased these products based on Diamond's express and implied health claims on the products' packaging. This packaging and the claims made thereon were created, made and/or directed primarily from, or at least a substantial proportion emanated from, California.

7.      Defendant Diamond is a food company engaged in processing, marketing and distributing culinary, in-shell and ingredient nuts and snack products. Defendant's products are sold in over 60,000 retail locations in the United States, and in 2009 the sales of those products generated $571 million in net sales. Diamond is a Delaware corporation with its principle place of business in San Francisco, California. Diamond maintains eleven locations in the United States, including six in California.

### JURISDICTION AND VENUE

8.      Jurisdiction of this Court is proper under 28 U.S.C. 1332, as complete diversity between the parties exists. Representative Plaintiff Elliot Zeisel is currently a citizen of New York residing in New York, New York. Defendant is incorporated in the State of Delaware and has its principle place of business in San Francisco, California. The nationwide Class consists of citizens and residents of states across the country.

3

1    9.    Upon information and belief, the amount in controversy exceeds $5,000,000 for

2  Representative Plaintiff and Class members collectively, exclusive of interest and costs, by virtue of

3  the combined purchase prices paid by Plaintiff and the Class, and the profit reaped by Defendant

4  from its transactions with Plaintiff and the Class, as a direct and proximate result of the wrongful

5  conduct alleged herein, and by virtue of the statutory, exemplary and/or punitive damages alleged

6  herein and the injunctive and equitable relief sought.

7    10.    Upon information and belief, based upon Defendant's sales of its products through

8  thousands of retail stores nationwide, more than one third of all Class members reside outside of

9  California, and the total number of Class members is at least 100 and is likely to number in the

10  thousands if not hundreds of thousands.

11    11.    Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).

12  Defendant maintains offices and has agents, transacts business or is found within this judicial

13  district. Moreover, a substantial portion of the underlying transactions and events complained of

14  herein occurred, and affected persons and entities, in this judicial district, and Defendant has

15  received substantial compensation from such transactions and business activity in this judicial

16  district, including as the result of purchases of Defendant's Shelled Walnuts products from retail

17  locations herein. Finally, Defendant inhabits and/or may be found in this judicial district, and the

18  interstate trade and commerce described herein is and has been carried out in part within this judicial

19  district.

20                                    **BACKGROUND**

21    12.    American consumers are health conscious and frequently take nutrition information

22  into consideration in selecting and purchasing food items.    Product package labels, including

23  nutrition labels, are vehicles that convey nutrition information to consumers which they can and do

24  use to make purchasing decisions.    As noted by Food and Drug Administration (FDA)

25  Commissioner Margaret Hamburg during an October 2009 media briefing, "Studies show that

26  consumers trust and believe the nutrition facts information and that many consumers use it to help

27  them build a healthy diet."

28

4

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1  13. The prevalence of claims about nutritional content on food packaging in the United

2 States has increased in recent years as manufacturers have sought to provide consumers with

3 nutrition information and thereby influence their purchasing decisions. The results of the FDA's

4 most recent Food Label and Package Survey found that approximately 4.8 percent of food products

5 sold in the United States had either a health claim or a qualified health claim on the food package,

6 and that more than half (53.2%) of the food products reviewed had nutrient content claims on the

7 packaging.

8 **FEDERAL LAWS REGULATE THE USE OF HEALTH CLAIMS**

9  14. The FDA is the agency responsible, in part, for safeguarding the nation's food supply

10 and assisting consumers in getting accurate, science-based information which they can use to make

11 healthy food choices and improve their health.

12  15. There are currently two mechanisms by which health claims may be reviewed and

13 approved by the FDA for use on food packaging. Authorization for unqualified "health claims" may

14 be obtained by petitioning the FDA if a health claim meets the statutory requirements of the Federal

15 Food Drug and Cosmetic Act, 21 U.S.C § 301 et seq., as amended by the Nutrition Labeling and

16 Education Act (NLEA), 21 U.S.C. § 341 et seq. Since September 1, 2003, the FDA has also

17 authorized petitions for review and approval of "qualified health claims," i.e., health claims

18 accompanied by disclaimers or which are otherwise "qualified," under a set of interim procedures

19 developed through the Consumer Health Information for Better Nutrition Initiative.

20  16. In 1990, Congress enacted NLEA, an amendment to the Federal Food, Drug and

21 Cosmetic Act, which charged the FDA to regulate nutrition label claims, including, in particular,

22 health claims. 21 U.S.C. § 343.

23  17. As defined in the regulations promulgated under NLEA, a "health claim" is "any

24 claim made on the label or in labeling of a food…that expressly or by implication…characterizes the

25 relationship of any substance to a disease or health related condition." 21 C.F.R. § 101.14(a)(1).

26 Health claims may be either express or implied. "Implied health claims include those statements,

27 symbols, vignettes, or other forms of communication that suggest, within the context in which they

28

5

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1  are presented, that a relationship exists between the presence or level of a substance in the food and a

2  disease or health-related condition." 21 C.F.R. § 101.14(a)(1).

3       18.    Under NLEA, health claims on packaging may be made only:

4            (i)    if the claim meets the requirements of the regulations of the
          Secretary promulgated under clause (B), and

5

6            (ii)   if the food for which the claim is made does not contain, as
          determined by the Secretary by regulation, any nutrient in an amount

7            which increases to persons in the general population the risk of a disease
          or health-related condition which is diet related, taking into account the

8            significance of the food in the total daily diet, except that the Secretary
          may by regulation permit such a claim based on a finding that such a claim

9            would assist consumers in maintaining healthy dietary practices and based
          on a requirement that the label contain a disclosure of the type required by

10            subparagraph (2)(B).

11

12  21 U.S.C. § 343(r)(3)(A).

13       19.    NLEA also requires that "The Secretary shall promulgate regulations authorizing

14  claims of the type described in subparagraph (1)(B) only if the Secretary determines, based on the

15  totality of publicly available scientific evidence (including evidence from well-designed studies

16  conducted in a manner which is consistent with generally recognized scientific procedures and

17  principles), that there is significant scientific agreement, among experts qualified by scientific

18  training and experience to evaluate such claims, that the claim is supported by such evidence." 21

19  U.S.C. § 343(r)(3)(B)(i).  Thus, for a "health claim" to be authorized under the regulations

20  promulgated pursuant to NLEA, there must be "significant scientific agreement" (SSA) that the

21  asserted health claim is true.

22       20.    In addition to procedures adopted pursuant to NLEA, in early 2003, the FDA

23  developed a set of interim procedures under which "qualified health claims"(QHCs) could be

24  authorized for use on food packaging and labels.

25       21.    As explained in the FDA's January 2009 Guidance for Industry: Evidence-Based

26  Review System for the Scientific Evaluation of Health Claims - Final, "When the evidence for a

27  substance-disease relationship is credible but does not meet the SSA standard, then the proposed

28

6

1 claim for the relationship should include qualifying language that identifies limits to the level of

2 scientific evidence to support the relationship." A copy of the January 2009 Guidance for Industry is

3 attached as Exhibit 1 to this Complaint.

4

5 22. Under the QHC interim procedures, FDA may exercise enforcement discretion for

6 QHCs when the claim meets all general requirements of 21 CFR 101.14, except for the requirements

7 that the claim meet the SSA standard and that the claim be made in accordance with an authorizing

regulation.

8

9 23. On March 9, 2004, the FDA exercised enforcement discretion over a QHC for

10 walnuts, based upon a petition filed on behalf of the California Walnut Commission requesting

11 review under both the SSA standard and the QHC interim procedures for the health claim, "Diets

including walnuts can reduce the risk of heart disease."

12

13 24. In its March 9, 2004 Letter of Enforcement Discretion - Walnuts and Coronary Heart

14 Disease (Docket No. 02P-0292) (hereinafter, "March 9 Letter of Enforcement Discretion"), the FDA

15 explained, in pertinent part, that:

16         The walnut petition does not identify a specific substance(s) in walnuts that is
          responsible for the purported benefit, but rather requests that walnuts be the subject of
17        the proposed claim. In the absence of an identified substance in walnuts that is
          response for the purported effect, FDA considered whether: a) the purported benefits
18        of walnuts are due to a substance that is unique to walnuts and can only be obtained if
          walnuts are included in diets on a daily basis at a minimally effective level; b) the
19        purported benefits of walnuts are due to a substance that is also found in other foods
          and, therefore, the benefits can be obtained by choosing among a variety of foods that
20        contain the substance; or c) the purported benefits are not due to a biologically active
          substance in the walnuts but rather to a replacement of other foods that increase CHD
21        risk.

22

23        The petition did not contain sufficient scientific evidence to enable the agency to
          identify a biologically active substance unique to walnuts or to a larger group of foods
24        that decreases CHD risk. Further, the petition did not contain sufficient evidence for
          the agency to determine that the beneficial effect is simply due to a replacement effect
25        from walnuts of other foods that increase CHD risk. The petition discusses the fact
          that walnuts, unlike other nuts, contain a relatively large proportion of alpha-linolenic
26        acid, an omega-3 polyunsaturated fatty acid (omega-3 PUFA). The petition suggests
          that the omega-3 PUFA content of walnuts adds to their purported benefits and also
27

28                                              7

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1

2

3

4

5

makes walnuts likely to be more effective than other nuts in reducing CHD risk. However, the petition did not include a comprehensive review of the relationship of omega-3 PUFA intakes and reduced CHD risk (i.e., did not include a review of the "totality of the evidence" on this relationship). Additionally, the petition did not include any studies that provided a basis for evaluating whether the omega-3 PUFA content of walnuts made it more effective than other nuts that lack similar amounts of this fatty acid. Therefore, FDA was not able to evaluate whether omega-3 PUFA contribute, in part or in total, to any benefit of walnuts in reducing CHD risk.

6

7

8

9

Although it is recognized that the beneficial effects of walnuts could be due to, in part, 1) the presence of unsaturated fats and/or fiber, 2) low levels of saturated fat and/or 3) the lack of cholesterol, there is insufficient evidence to identify the substance(s), if any, in walnuts that may be responsible for the beneficial effects. Therefore, FDA considers walnuts to be the subject of the claim for purposes of this review.

10

11

A copy of the March 9 Letter of Enforcement Discretion is attached as Exhibit 2 to this Complaint.

12

13

14

15

16

25. Based upon its review, the March 9 Letter of Enforcement Discretion concluded, based upon assessment of intervention studies, observation studies, a report by the Life Science Research Office, and outside expert reviews, that "there is not significant scientific agreement among qualified experts that a relationship exists between walnut consumption and reduced risk of CHD."

17

18

19

26. The March 9 Letter of Enforcement Discretion also considered whether to exercise its enforcement discretion for a QHC relating to walnuts and heart disease. Specifically, the letter stated:

20

21

22

23

24

25

26

27

For a claim that does not meet the significant scientific agreement standard, FDA considers whether the exercise of enforcement discretion might be appropriate for a qualified health claim. Based on the results from two intervention studies of moderate scientific quality (Iwamoto et al., 2002; Sabaté et al., 1993), there is a suggestion of an LDL-C lowering benefit resulting from relatively high daily consumption of walnuts. Moreover, although it is not possible to determine whether walnuts have an independent benefit in reducing LDL-C, or whether the benefit is the result of the replacement of other foods that tend to raise LDL-C, the available evidence suggests that any beneficial effect from walnuts occurs when walnuts are used as a calorie replacement. In addition, the observation studies do not provide an adequate basis for determining whether an inverse association of nut consumption frequency with CHD risk is related to dietary patterns for which nuts serve as a marker rather than a key responsible component, or whether an

28

8

1
2

association is related specifically to intakes of walnuts or to other nuts. Therefore, the observation studies do not provide supportive evidence of a relationship between walnuts and reduced risk of CHD.

3
4
5
6

After review the scientific evidence in your petition, FDA concludes that there is very limited and preliminary scientific evidence supporting the relationship between consumption of walnuts and reduced CHD. Therefore, FDA intends to consider the exercise of its enforcement discretion with regard to a qualified health claim on the label or in labeling of whole or chopped walnuts.

7

…Thus, FDA will consider exercising enforcement discretion for a qualified claim as presented below:

8
9
10

Supportive but not conclusive research shows that eating 1.5 ounces per day of walnuts, as part of a low saturated fat and low cholesterol diet and not resulting increased caloric intake, may reduce the risk of coronary heart disease. See nutrition information for fat [and calorie] content.

11

## DIAMOND'S SHELLED WALNUTS ARE MISBRANDED AND MISLEADING

12
13

27. Since at least 2006, Defendant Diamond has used false and misleading packaging to entice consumers to purchase its Shelled Walnuts products.

14
15
16
17
18

28. The front and back of the Shelled Walnuts product labels have included the phrase "OMEGA 3 2.5 g per serving" with adjacent heart symbols. Within the context of the label, the heart symbols adjacent to information about the amount of omega-3 in the product constitute implied health claims about consumption of omega-3 fatty acids found in walnuts and a reduced risk of coronary heart disease.

19
20
21
22
23
24
25
26
27

29. The back of the Shelled Walnuts product labels have also included the following statement: "The omega-3 in walnuts can help you get the proper balance of fatty acids your body needs for promoting and maintaining heart health. In fact, according to the Food and Drug Administration, supportive but not conclusive research shows that eating 1.5 oz. of walnuts per day, as part of a low saturated fat and low cholesterol diet, and not resulting in increased caloric intake, may reduce the risk of coronary heart disease. Please refer to nutrition information for fat content and other details about the nutritional profile of walnuts." These statements constitute express claims that consumption of the omega-3 fatty acids in walnuts promotes heart health and lowers the risk of coronary heart disease.

28

9

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1    30.    Diamond has used this misleading packaging despite publication by the FDA on its

2  website of the March 9 Letter of Enforcement Discretion, which specifically limits the existing QHC

3  for walnuts and excluded claims based upon omega-3 fatty acids, for which there is insufficient

4  evidence to support authorization under either the SSA or QHC interim procedures.

5    31.    Although both the NLEA regulatory review process and the QHC interim review

6  procedures have been available since at least 2003, Diamond has never submitted a petition seeking

7  review of the express and implied health claims on its Shelled Walnuts.

8    32.    Instead, Diamond used the misbranded and misleading statements on its packaging to

9  sell its Shelled Walnuts products to thousands of consumers nationwide and to profit from those

10  transactions.

11

12              **THE FDA FINDS THAT DIAMOND'S SHELLED WALNUTS ARE**

13                      **MISBRANDED AND MISLEADING**

14    33.    In October 2009, the FDA issued a Guidance For Industry: Letter Regarding Point Of

15  Purchase Food Labeling ("2009 FOP Guidance"), to address its concerns about front-of-package

16  labels. A copy of the 2009 FOP Guidance is attached as Exhibit 3 to this Complaint.

17  34.    In pertinent part, the 2009 FOP Guidance advised the food manufacturing industry:

18  Dear Industry:

19  Point of purchase labeling including Front of Package (FOP) labeling is voluntary
information that is intended to convey to consumers the nutritional attributes of a
20  food. Point of purchase labeling often includes symbols that are typically linked
to a set of nutritional criteria developed by food manufacturers, grocery stores,
21  trade organizations, and health organizations. ... Nutrient-specific symbols
provide quantitative, evaluative, or both kinds of information on selected nutrients
22  in a product without comparing the product's overall nutritional quality to that of
23  its counterparts.

24  ... FDA recognizes that point of purchase labeling can be a way of promoting
informed food choices and helping consumers construct healthier diets in
25  accordance with the Dietary Guidelines for Americans. FOP or shelf labeling that
provides consumers with readily accessible information about a product's
26  nutritional profile, in a manner that is consistent with and linked to the required
27  Nutrition Facts panel, responds to today's marketplace realities and can be part of

28                              10

the education and outreach consumers need to understand and act on nutrition information at the point of purchase.

However, FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.131 and Subpart D of Part 1012 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements.

… Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

35.     The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised food manufacturers that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

36.     Despite the issuance of the 2009 FOP Guidance, Defendant Diamond did not remove the false and misleading statements from its Shelled Walnuts product labels.

11

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1    37.    On February 22, 2010, the FDA issued findings that Defendant's Shelled Walnuts

2    products were "in violation of the Federal Food, Drug, and Cosmetic Act and the applicable

3    regulations in Title 21, Code of Federal Regulations" and "misbranded under section $403(r)(1)(B)$ of

4    the Act [21 U.S.C. § $342(r)(1)(B)$ in that [Diamond's] products bear health claims that are not

5    authorized by the FDA."

6    38.    Diamond was advised of the FDA's findings through a "Warning Letter" addressed to

7    Michael J. Mendes, Diamond's President and Chief Executive. A copy of the Warning Letter is

8    attached as Exhibit 4 to this Complaint.

9    39.    The Warning Letter advised Diamond that its Shelled Walnuts products were "in

10   violation of the Federal Food, Drug, and Cosmetic Act...and the applicable regulations in Title 21,

11   Code of Federal Regulations."

12   40.    The Warning Letter explained:

13   The Food and Drug Administration (FDA) has reviewed the label for your "Diamond
     of California Shelled Walnuts" products and your website at www.diamondnuts.com.
14   Based on our review, we have concluded that your walnut products are in violation of
     the Federal Food, Drug, and Cosmetic Act (the Act) and the applicable regulations in
15   Title 21, Code of Federal Regulations (21 CFR). You can find copies of the Act and
16   these regulations through links in FDA's home page at http://www.fda.gov.

17   ...

18   **Product Label**

19   Further, your "Diamond of California Shelled Walnut" product is misbranded under
20   section $403(r)(1)(B)$ of the Act [21 U.S.C. § $343(r)(1)(B)$] in that your product bears
     health claims that are not authorized by the FDA. The front and back of your product
21   label bears the phrase "OMEGA 3 2.5 g per serving." Within the context of this label,
22   the heart symbols adjacent to information about the amount of omega-3 in the
     product, constitute implied health claims about consumption of omega-3 and a
23   reduced risk of coronary heart disease [21 CFR 101. 14(a)].

24   The back of your product label also bears the following statement: "The omega-3 in
     walnuts can help you get the proper balance of fatty acids your body needs for
25   promoting and maintaining heart health. In fact, according to the Food and Drug
26   Administration, supportive but not conclusive research shows that eating 1.5 oz of
     walnuts per day, as part of a low saturated fat and low cholesterol diet, and not

27

28
                                        12
     COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
     Case No.:

resulting in increased caloric intake, may reduce the risk of coronary heart disease. Please refer to nutrition information for fat content and other details about the nutritional profile of walnuts." Although FDA exercises enforcement discretion over the last two sentences of this statement, which meet the criteria for a qualified health claim for walnuts and coronary heart disease, the last two sentences read in conjunction with the first sentence makes the entire statement an unauthorized health claim.

The statement suggests that the evidence supporting a relationship between walnuts and coronary heart disease is related to the omega-3 fatty acid content of walnuts. There is not sufficient evidence to identify a biologically active substance in walnuts that reduces the risk of CHD. Therefore, the above statement is an unauthorized health claim. This letter is not intended to be an inclusive review of your products and their labeling. It is your responsibility to ensure that all of your products comply with the Act and its implementing regulations.

41. The Warning Letter to Diamond advised in closing: "You should take prompt action to correct these violations. Failure to do so may result in regulatory action without further notice. Such action may include, but is not limited to, seizure or injunction."

42. On March 3, 2010, the FDA issued an "Open Letter to Industry from Dr. Hamburg" (hereinafter, "Open Letter"). A copy of the Open Letter is attached as Exhibit 5 to this Complaint.

43. The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part, the letter stated:

As we move forward in those areas, I must note, however, that there is one area in which more progress is needed. As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our

13

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1

2

3

regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices.

4

5

6

44.    In conjunction with issuance of the Open Letter, the FDA placed copies of warning letters to several food manufacturers on its website, including the FDA's February 22, 2010 Warning Letter to Defendant.

7

**PLAINTIFF ELLIOT ZEISEL**

8

9

45.    Plaintiff Elliot Zeisel lives in New York, New York. He uses product labels to help him make decisions about which foods to purchase.

10

11

12

13

14

15

16

17

18

46.    Plaintiff reviewed Diamond's representations on its Shelled Walnuts product labels regarding omega-3 fatty acids and the affect of consumption on risk of heart disease before deciding to purchase the Shelled Walnuts, and these representations were a substantial motivating factor in his decision to purchase Diamond's Shelled Walnuts. Specifically, based upon these representations, Plaintiff believed that consuming the omega-3 fatty acids found in Diamond's Shelled Walnuts products would be beneficial to him, that it would assist him in getting a proper balance of fatty acids, that it would promote heart health, and that it would reduce his risk of coronary heart disease. It was on this basis that Plaintiff decided to purchase Diamond's Shelled Walnuts products from retail stores located in New York, New York.

19

20

21

22

47.    As a result of these transactions, Plaintiff paid money to purchase food items that did not provide the health benefits that were claimed on the package labels. He also lost the opportunity to purchase alternative food items for which accurate, science-based research supports a link between consumption and heart health.

23

**CLASS ACTION ALLEGATIONS**

24

25

26

27

48.    Plaintiff brings this action on behalf of himself and on behalf of all other members of the Class ("Class"), defined as all consumers who purchased Diamond of California Shelled Walnuts products on or after March 19, 2006 in the United States. Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), and (b)(1), 23(b)(2) and 23(b)(3).

28

14

1    49.    Upon information and belief, there are thousands of Class members who are
2  geographically dispersed throughout the United States. Therefore, individual joinder of all members
3  of the Class would be impracticable.

4    50.    Common questions of law or fact exist as to all members of the Class.    These
5  questions predominate over the questions affecting only individual class members.  These common
6  legal or factual questions include:

7            a.    whether Diamond's representations are likely to deceive class
8                  members or the general public;

9            b.    whether Diamond's actions described herein violate California's
10                 Business and Professions Code, sections 17200 et seq.;

11           c.    whether Diamond's actions described herein violate California's
12                 Business and Professions Code, sections 17500 et seq.;

13           d.    whether Diamond's actions violate California's Consumer Legal
14                 Remedies Act, California Civil Code sections 1750 et seq.; and

15           e.    the appropriate measure of damages and/or restitution.

16   51.    Plaintiff's claims are typical of the claims of the Class, in that Plaintiff was a
17 consumer who purchased Diamond's Shelled Walnuts products with packaging representations that
18 the omega-3 fatty acids in walnuts promote heart health and reduce the risk of coronary heart
19 disease. Plaintiff, therefore, is no different in any relevant respect from any other class member, and
20 the relief sought is common to the Class.

21   52.    Plaintiff is an adequate representative of the Class because his interests do not
22 conflict with the interests of the class members he seeks to represent, and he has retained counsel
23 competent and experienced in conducting complex class action litigation.  Plaintiff and his counsel
24 will adequately protect the interests of the Class.

25   53.    A class action is superior to other available means for the fair and efficient
26 adjudication of this dispute. The damages suffered by each individual class member likely will be
27 relatively small, especially given the burden and expense of individual prosecution of the complex

28

15
COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1   litigation necessitated by Diamond's conduct. Thus, it would be virtually impossible for the class
2   members individually to effectively redress the wrongs done to them. Moreover, even if the class
3   members could afford individual actions, it would still not be preferable to class wide litigation.
4   Individualized actions present the potential for inconsistent or contradictory judgments. By contrast,
5   a class action presents far fewer management difficulties and provides the benefits of single
6   adjudication, economies of scale, and comprehensive supervision by a single court.

7       54.    In the alternative, the Class may be certified because Diamond has acted or refused to
8   act on grounds generally applicable to the Class, thereby making appropriate preliminary and final
9   equitable relief with respect to the Class.

10
## FIRST CAUSE OF ACTION
("Unlawful" Business Practices in Violation of
11   The Unfair Competition Law ("UCL"), Bus. & Prof. Code 17200, et seq.)

12

13       55.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates
14   them as if they were fully written herein.

15       56.    The UCL defines unfair business competition to include any "unlawful, unfair or
16   fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal.
17   Bus. Prof. Code 17200.

18       57.    A business act or practice is "unlawful" if it violates any established state or federal
19   law.

20       58.    On February 22, 2010, the FDA issued findings that Defendant's Shelled Walnuts
21   products' packaging were "in violation of the Federal Food, Drug, and Cosmetic Act and the
22   applicable regulations in Title 21, Code of Federal Regulations" and "misbranded under section
23   $403(r)(1)(B)$ of the Act [21 U.S.C. § $342(r)(1)(B)$ in that [Diamond's] products bear health claims
24   that are not authorized by the FDA."

25       59.    Diamond has violated, and continues to violate the "unlawful" prong of the UCL
26   through its unauthorized health claims and misbranded packaging on its Shelled Walnuts products.
27   By committing the acts and practices alleged above, Diamond has engaged, and continues to be

28

16
COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1  engaged, in unlawful business practices within the meaning of California Business and Professions
2  Code 17200 et seq.

3       60.    Through its unlawful acts and practices, Diamond has obtained, and continues to
4  unfairly obtain, money from members of the Class.  As such, Plaintiff requests that this Court cause
5  Diamond to restore this money to Plaintiff and all Class members, and to enjoin Diamond from
6  continuing to violate the Unfair Competition Law as discussed herein.  Otherwise, the Class may be
7  irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

8                          **SECOND CAUSE OF ACTION**
                      **("Unfair" Business Practices in Violation of**
9           **The Unfair Competition Law ("UCL"), Bus. & Prof. Code 17200, et seq.)**

10      61.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates
11  them as if they were fully written herein.

12      62.    The UCL defines unfair business competition to include any "unlawful, unfair or
13  fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal.
14  Bus. Prof. Code 17200.

15      63.    A business act or practice is "unfair" under the Unfair Competition Law if the
16  reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the
17  harm to the alleged victims.

18      64.    Diamond has and continues to violate the "unfair" prong of the UCL through its
19  misleading health claims on its Shelled Walnuts products as specified throughout this Complaint.
20  The gravity of the harm to members of the Class resulting from such unfair acts and practices
21  outweighs any conceivable reasons, justifications and/or motives of Diamond for engaging in such
22  deceptive acts and practices.  By committing the acts and practices alleged above, Diamond has
23  engaged, and continues to be engaged, in unfair business practices within the meaning of California
24  Business and Professions Code 17200 et seq.

25      65.    Through its unfair acts and practices, Diamond has obtained, and continues to
26  unfairly obtain, money from members of the Class.  As such, Plaintiff requests that this Court cause
27  Diamond to restore this money to Plaintiff and all Class members, and to enjoin Diamond from

28                                        17

1 continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Class may be

2 irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### THIRD CAUSE OF ACTION
### ("Fraudulent" Business Practices in Violation of
### The Unfair Competition Law ("UCL"), Bus. & Prof. Code 17200, et seq.)

66.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

67.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

68.    A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

69.    Diamond's acts and practices as described herein have deceived and/or are likely to deceive members of the consuming public. Specifically, Diamond's health claims on its products labels and website, including "OMEGA 3 2.5 g per serving" adjacent to heart symbols and its statements that "The omega-3 in walnuts can help you get the proper balance of fatty acids your body needs for promoting and maintaining heart health." are likely to deceive the average consumer into believing that the omega-3 fatty acids in walnuts are beneficial, promote heart health when consumed, and reduce the risk of CHD, when in fact there is not sufficient scientific evidence to support such claims.

70.    As a result of the conduct described above, Diamond has been, and will continue to be, unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, Diamond has been unjustly enriched by the profits it has obtained from Plaintiff and the Class from the purchases of Shelled Walnuts products made by them.

71.    Through its unfair acts and practices, Diamond has improperly obtained, and continues to improperly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Diamond to restore this money to Plaintiff and all Class members, and to enjoin Diamond from continuing to violate the Unfair Competition Law as discussed herein. Otherwise,

18

1    the Class may be irreparably harmed and/or denied an effective and complete remedy if such an

2    order is not granted.

### FOURTH CAUSE OF ACTION
### (False Advertising in Violation of
### California Business & Professions Code 17500, et seq.)

72.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates

them as if they were fully written herein.

73.    Plaintiff hereby incorporates by reference the allegations contained above. This cause

of action is brought by Plaintiff on behalf of himself, the Class members, and the general public.

74.    Defendant uses advertising on its packaging to sell its Shelled Walnuts products. As

described herein, Defendant is disseminating advertising concerning its goods which by its very

nature is deceptive, untrue, or misleading within the meaning of California Business & Professions

Code 17500, et seq. Such advertisements are likely to deceive, and continue to deceive, members of

the putative class and the general public.

75.    In making and disseminating the statements alleged herein, Defendant knew or should

have known that the statements were untrue or misleading, and acted in violation of California

Business & Professions Code 17500, et seq.

76.    The misrepresentations and non-disclosures by Defendant of the material facts

detailed above constitute false and misleading advertising and therefore constitute a violation of,

California Business & Professions Code 17500, et seq.

77.    Through their deceptive acts and practices, Defendant has improperly and illegally

obtained money from Plaintiff and members of the putative class. As such, Plaintiff requests that

this Court cause Defendant to restore this money to Plaintiff and members of the putative class, and

to enjoin Defendant from continuing to violate California Business & Professions Code §17500, et

seq., as discussed above. Otherwise, Plaintiff and those similarly situated will continue to be harmed

by Defendant's false and/or misleading advertising.

78.    Pursuant to California Business & Professions Code 17535, Plaintiff seeks an order of

this Court ordering Defendant to fully disclose the true nature of its misrepresentations. Plaintiff

19

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1   additionally requests an order requiring Defendant to disgorge its ill-gotten gains and/or award full

2   restitution of all monies wrongfully acquired by Defendant by means of such acts of false

3   advertising, plus interest and attorneys fees so as to restore any and all monies which were acquired

4   and obtained by means of such untrue and misleading advertising, misrepresentations and omissions,

5   and which ill-gotten gains are still retained by Defendant. Plaintiff and the putative Class may be

6   irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

7        79.    Such conduct is ongoing and continues to this date. Plaintiff and the putative Class

8   are therefore entitled to the relief described below.

9                           **FIFTH CAUSE OF ACTION**

**(Violation of the Consumers Legal Remedies Act,**

10                      **California Civil Code 1750, et seq.)**

11        80.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates

12   them as if they were fully written herein.

13        81.    Plaintiff realleges and incorporates herein by reference each of the foregoing

14   paragraphs, and further alleges as follows.

15        82.    This cause of action is brought pursuant to the Consumers Legal Remedies Act,

16   California Civil Code1750, et seq. (the "CLRA").

17        83.    Plaintiff and each member of the proposed Class are "consumers" within the meaning

18   of Civil Code 1761(d).

19        84.    The purchases of Diamond's Shelled Walnuts products by consumers constitute

20   "transactions" within the meaning of Civil Code 1761(e) and the Shelled Walnuts products offered

21   by Diamond constitute "goods" within the meaning of Civil Code 1761(a).

22        85.    Diamond has violated, and continues to violate, the CLRA in at least the following

23   respects:

24             a.     in violation of *Civil Code* §1770(a)(5), Diamond represents that the

25                 transaction had characteristics which it did not have;

26             b.     in violation of *Civil Code* § 1770(a)(7), Diamond represents that its goods

27                 were of a particular standard, quality or grade, which they were not; and

28

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1

2

           c.      in violation of *Civil Code* § 1770(a)(9), Diamond advertised its goods with the intent not to provide what it advertised.

3      86.    Plaintiff and the members of the Class request that this Court enjoin Diamond from

4 continuing to engage in the unlawful and deceptive methods, acts and practices alleged above,

5 pursuant to California Civil Code 1780(a)(2). Unless Diamond is permanently enjoined from

6 continuing to engage in such violations of the CLRA, future consumers of Diamond's Shelled

7 Walnuts products will be damaged by its acts and practices in the same way as have Plaintiff and the

8 members of the proposed Class.

9      87.    Pursuant to Civil Code 1782, in conjunction with the filing of this action, Plaintiff

10 notified Diamond in writing of the particular violations of Civil Code 1770 and demanded that

11 Diamond repair, or otherwise rectify the problems associated with its illegal behavior detailed above,

12 which actions are in violation of Civil Code 1770.

13      88.    If Diamond fails to adequately respond to Plaintiff's demand within 30 days of

14 Plaintiff's notice, pursuant to Civil Code 1782(b), Plaintiff hereby requests, and may amend or seek

15 leave to amend his complaint to request the following damages as provided for in Civil Code 1780:

16           a.      actual damages in excess of the jurisdictional limits of this Court;

17           b.      an order enjoining methods, acts and/or practices, as outlined above, which

18                  are in violation of Civil Code 1770;

19           c.      any other relief which the Court deems proper; and court costs and attorneys'

20                  fees.

21

22

### SIXTH CAUSE OF ACTION
### (Restitution Based On Quasi-Contract/Unjust Enrichment)

23

24      89.    Plaintiff hereby incorporates by reference each and every allegation contained in the

25 preceding paragraphs of this Complaint as if fully rewritten herein. Plaintiff pleads this Count in the

26 alternative.

27      90.    Diamond's conduct in enticing Plaintiff and the Class to purchase its Shelled Walnuts

28 products through its false and misleading packaging as described throughout this Complaint is

21

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1  unlawful. Diamond took monies from Plaintiffs and Class members for a product with promised

2  nutritional properties, even though the product it sold does not in fact possess those promised

3  nutritional properties. Diamond has been unjustly enriched at the expense of Plaintiffs and the Class

4  members as result of its unlawful conduct alleged herein, thereby creating a quasi-contractual

5  obligation on Diamond to restore these ill-gotten gains to Plaintiffs and the Class.

6      91.    As a direct and proximate result of Diamond's unjust enrichment, Plaintiffs and the

7  Class members are entitled to restitution in an amount to be proved at trial.

8  <center>**PRAYER**</center>

9      WHEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the

10  Class, requests award and relief as follows:

11      A.    An order certifying that this action is properly brought and may be maintained as a

12  class action, that Plaintiff be appointed Class Representative and Plaintiff's counsel be appointed

13  Class Counsel.

14      B.    Restitution in such amount that Plaintiff and all Class members paid to purchase

15  Shelled Walnuts products, or the profits Diamond obtained from those transactions.

16      C.    An order enjoining Diamond from advertising its products misleadingly, in violation

17  of FDA regulatory guidelines.

18      D.    An order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and

19  pre and post-judgment interest.

20      E.An order requiring an accounting for, and imposition of a constructive trust upon, all

21  monies received by Diamond as a result of the unfair, misleading, fraudulent and unlawful conduct

22  alleged herein.

23      F.    Such other and further relief as may be deemed necessary or appropriate.

24

25

26

27

28

<center>22</center>
COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.:

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a trial by jury on all causes of action and/or issues so triable.

3

Dated: March 19, 2010

4

By: _____

5

Janet Lindner Spielberg, Esquire

6

LAW OFFICE OF JANET LINDNER
   SPIELBERG

7

12400 Wilshire Boulevard
Suite 400

8

Los Angeles, California 90025
Telephone: (310) 392-8801

9

Facsimile: (310) 278-5938

10

Michael D. Braun

11

BRAUN LAW GROUP, P.C.
10680 West Pico Boulevard, Suite 280

12

Los Angeles, CA 90064
Tel:  (310) 836-6000

13

Fax:  (310) 836-6010

14

15

***ATTORNEYS FOR PLAINTIFF***

16

17

18

19

20

21

22

23

24

25

26

27

28

23

COMPLAINT for Damages, Equitable, Declaratory and Injunctive Relief
Case No.: